**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

MICHELLE ECHOLS                                                                    PLAINTIFF

v.                                          NO. 3:06CV00132JLH

MICHAEL J. ASTRUE, Commissioner,[1]
SOCIAL SECURITY ADMINISTRATION                                      DEFENDANT

## OPINION

Michelle Echols brings this action under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for judicial review of a final decision of the Commissioner of the Social Security Administration denying her claim for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 416(i) and 423, for the period from October 1, 2002, to June 30, 2003. Both parties have submitted briefs, and the case is ready for disposition. For the following reasons, the Commissioner's decision to deny benefits is reversed, and this case is remanded for reconsideration.

## I.

Echols filed her application for benefits on July 15, 2003. Echols alleged disability beginning October 10, 2000. Her claims were denied initially and upon reconsideration. Pursuant to Echols's request, an Administrative Law Judge held a hearing on July 19, 2005, at which Echols, her husband Mark, and a vocational expert testified. The ALJ issued a decision denying Echols's claim for benefits on September 23, 2005. The Appeals Council denied Echols's request for review, making it the final decision of the Commissioner. Echols seeks judicial review of that decision.

---

[1] Michael J. Astrue was sworn in as Commissioner of the Social Security Administration on February 12, 2007. He, therefore, is substituted for Jo Anne B. Barnhart under Rule 25(d)(1) of the Federal Rules of Civil Procedure.

## II.

Echols was born on May 26, 1971, and was 34 at the time of the ALJ's hearing. From 1993 to 1997, Echols worked as a bank teller. Echols left her job to go to nursing school full-time. Echols graduated from nursing school in 2000 and is licensed as a registered nurse. She worked as a registered nurse until October 2002.

A.    MEDICAL EVIDENCE IN THE RECORD

Echols's health problems began shortly after the birth of her fourth child in October 2000. Echols had an epidural during delivery that was left in place as anesthesia for a tubal ligation performed the next day. Immediately after delivery, Echols experienced lower extremity weakness and paralysis which lasted several hours. Echols recovered and was discharged two days after delivery. Two days later, Echols was readmitted to the hospital with another episode of paraplegia as well as leg cramps and pain. Two MRI's taken on her spine and pelvis showed no demonstrated neurologic abnormality. An MRI to the brain was limited but also demonstrated no abnormality. Dr. Mary Bell could not determine the origin of her leg pain. Echols improved enough to be discharged on Flexeril.

Echols was referred to Dr. Kenneth Chan. Echols complained of numbness in her lower extremities and right thigh as well as muscle spasms, though both symptoms were decreasing. Dr. Chan's physical exam of Echols on October 26 was normal except for hip flexor weakness, abduction weakness to the hip bilaterally, and antalgic gait. Dr. Chan noted that Echols's previous MRI's were unremarkable. Dr. Robert Taylor performed a lower extremity venous ultrasound on Echols on November 2, 2000. He found that all veins were normal in appearance and collapsed completely with compression. His impression was "no deep vein thrombi identified." On

November 10, 2000, Dr. Chan administered electromyography (EMG) and nerve conduction velocity (NCV) tests on Echols. Dr. Chan interpreted the results of those tests as "[n]ormal EMG/NCV of both lower extremities without electrical evidence for radiculopathy, plexopathy, or peripheral neuropathy."

Echols was admitted to the hospital on December 11, 2000, on an outpatient basis for complaints of muscle weakness and fatigue. Erythrocyte sedimentation rate (ESR) and thyroid-stimulating hormone (TSH) tests were performed. The results of the ESR were abnormal, while Echols's TSH result was low.

The record contains little medical evidence from January 2001 to December 2002. In November 2001, Echols was hospitalized for wheezing and "SUB." X-rays taken of her chest revealed that Echols's lungs were clear and her heart and great vessels were normal. A physical exam dated August 26, 2002, showed that Echols had normal range of motion with non-tender extremities. A September 11, 2002, office note from the Northeast Arkansas Clinic revealed that Echols was complaining about swelling in her joints and shoulder pain. Echols's physical exam showed mild decreased range of motion in the left shoulder, but no cyanosis or swelling in her extremities and no gross motor or sensory deficits. Echols was diagnosed with left shoulder bursitis and nonspecific arthritis, as well as morning stiffness lasting less than 15 minutes. On December 19, Echols was referred to the Semmes Murphey Neurologic and Spine Institute in Memphis for her symptoms of numbness, pain, and heaviness in her legs.

In January 2003, Echols began seeing doctors at Semmes Murphey. Echols complained of numbness and pain in her lower extremities as well as heaviness in her left leg, swelling in her wrist and ankles, and pain going through her left groin. EMG and NCV tests performed on January 16,

2003, showed left mild to moderate peripheral neuropathy and left L-5 radiculopathy. An MRI conducted on Echols's lumbar spine was negative. Dr. Michael Deshazo did not see any evidence of peripheral neuropathy from the tests, though he was surprised to see the abnormalities that appeared in the EMG and NCV tests. Because Echols appeared to be improving, Dr. Deshazo was content to just watch Echols and see if Echols's symptoms continued to improve.

Dr. Daniel Menkes saw Echols on March 11, 2003. He noted that she described muscle weakness that was now affecting her upper extremities, temperature fluctuations, and fine hand tremors. He noted that she had gained weight. Dr. Menkes performed a physical exam on Echols that was unremarkable. Dr. Menkes diagnosed Echols with transverse myelitis, polymyositis, and possibly an autoimmune disorder such as hyperthyroidism. Dr. Menkes explained to Echols that she did not meet the definition of clinically definite multiple sclerosis although she was at increased risk of developing it. Dr. Menkes prescribed prednisone and referred Echols to physical therapy three times a week.

Echols attended physical therapy on March 28, 2003. Echols told Natasha Pittman, the physical therapist, that she had shoulder pain, that her legs would swell and feel heavy, and that she would have episodes of paralysis that she believed were possibly side effects of the epidural she had during labor two and a half years ago. Echols reported that her pain, on a scale of one to ten, was currently a three "at best." Pittman observed that Echols had a slow gait and slight staggering but no range of motion deficits. Echols attended physical therapy on four more occasions. On April 29, 2003, however, the physical therapy was discontinued. Pittman wrote that the physical therapy was discontinued due to Echols's lack of objective deficits and her noncompliance with the recommended home exercise program. Pittman wrote that Echols demonstrated no palpable swelling

4

and no need for skilled intervention.  Pittman recommended that Echols utilize a fitness center for

general fitness.  Dr. Menkes signed Pittman's reevaluation of Echols.

Dr. Deshazo saw Echols again on March 18, 2003, after an MRI scan of the thoracic spine

that came back normal.  After finding Echols's neurologic exam to be "essentially normal," Dr.

Deshazo wrote:

> I really could not find any evidence of a neurologic deficit or a problem to cause her
> symptoms. . . .  I told [Echols] at this point in time I agree with Dr. Menkes there is
> no evidence of any peripheral neurologic disorder, but also could find no evidence
> of any central neurologic disorder.  I would be very reluctant to treat her with IV high
> dose steroids or Avonex without evidence of any neurologic deficits or abnormality
> on MRI scan.  I told her that I would talk to Menkes further about the case.

Echols saw Dr. Michael Jacewicz at Semmes Murphey on May 30, 2005.  Dr. Jacewicz noted mild

"[p]roximal greater than distal muscle weakness" but that otherwise Echols walked quite normally.

Dr. Jacewicz did not find any real tenderness on examination.  He wrote, "The overall flavor that I

get regarding her symptoms is rheumatological.  She did have a rheumatoid factor tested about 1-1/2

years ago.  That was negative.  An EMG study by Dr. Chen made no mention of myopathic changes.

He did find evidence of a mild neuropathy."  Dr. Jacewicz recommended further rheumatological

testing.

On July 24, 2003, Echols underwent a muscle biopsy performed by Dr. Michael Muhlbauer.

According to Dr. Menkes's notes dated October 21, 2003, the biopsy demonstrated no evidence of

an inflammatory myopathy.  Dr. Menkes wrote as his assessment of Echols on that date:

> I am of the opinion that three separate conditions may be operative in this woman's
> case.  I will discuss each of these entities separately.  The first is that of a mild
> inflammatory myopathy.  I support this by the fact that her CPK remains persistently
> elevated and that she noted an inverse correlation between her prednisone dose and
> her symptoms.  Since she is unable to tolerate immunosuppressive therapy, it might
> be reasonable just to prescribe an anti-inflammatory medication for symptomatic

relief.  She had no evidence of polymyositis by her muscle biopsy and she has normal strength on examination today.   Therefore, there is no definite indication for additional immunosuppressive medications at this particular point in time. . . .

Her husband also reports nocturnal stertor.  She has a 15-inch neck size, which is rather significant for a woman of her short stature.  Therefore the findings may be consistent with the diagnosis of obstructive sleep apnea.  She agreed to pursue a sleep study as recommended in the following section.

She also reports symptoms that are often noted in somatoform pain disorder.  She does not definitely have this diagnosis at this particular point in time.  However, she reports significant symptoms of anxiety that may be responsive to antidepressant medication. . . .

She also reports symptoms consistent with chronic allergic rhinitis.  She stated that she did not want to take any oral medication for this.  She also stated that she did not want to take a nasal inhaler. However she did agree to an oral inhaler that she would exhale through her nose.

Dr. Menkes prescribed Bextra and Lexapro.

On August 1, 2003, Echols was hospitalized for tachycardia and shortness of breath. Echols's heart rate was varying between 110 and 120 and she was in moderate respiratory distress. She was admitted to the ICU for observation.  Echols was given Toprol XL.  She improved and was sent home August 4 in a stable condition to resume her medications of prednisone and methotrexate. An echocardiogram administered on August 11 showed questionable right ventricular enlargement, mild prolapse of the anterior mitral valve leaflet in peak systole, mild mitral regurgitation, and no evidence of systolic dysfunction with an ejection fraction in the range of 55-60%.  Dr. Gloria Burns believed that Echols could benefit from an endocrinology evaluation and therefore referred her to Dr. Ralph Goodman.  Repeat thyroid function tests performed on Echols were normal; they showed only a mild elevation of thyroid peroxidase.  On August 25, Dr. Goodman wrote that Echols's situation was complicated, "but in essence, she has a goiter with positive thyroid antibodies, low

normal thyroid values, and low normal TSH."  Goodman suspected that the high dose steroids might have been complicating the correct interpretation of the TSH and that Echols might actually have been mildly hypothyroid.

Echols completed a disability supplemental interview outline on September 3, 2003.  Echols noted on that form that, although washing her hair was impossible and combing was sometimes difficult, she only occasionally needed assistance to bathe and dress.  She also stated that she only occasionally needed help doing the laundry and dishes, changing sheets, ironing, vacuuming and sweeping, and taking out the trash.  She checked that she still did go to the bank and the post office but did no grocery or clothes shopping.  She wrote, "family members + husband been going to store + running errands that I cannot do."  She stated that she prepared meals one to two days per week and that meal preparation took anywhere from fifteen minutes to two hours.  She checked "no" for "walk for exercise or errands" and stated that "driving is limited to necessities only."  She also checked "yes" for "attend church" and stated that she occasionally visited friends and relatives. When asked how her disability interfered with her work, she wrote, "lower extremities would swell + ache making it hard to walk or stand for long periods of time."  Echols checked "yes" for the question asking if she suffered from unusual fatigue.  For the question "Do you require naps or rest," Echols checked "yes."  As for how often she took naps, Echols checked "once a day."

When asked to describe her pain or other symptoms, Echols wrote, "aching in majority of body, esp[ecially] upper + lower extremities, swelling, [shortness of breath], rapid heart be[at], dizziness, occas[ional] chest pain, low grade fevers, nervousnes[s,] irritabilit[y,] back aches, muscle ach[es,] paralysis."  Echols wrote that the pain was located in the majority of her body, that it lasted for hours and days, that she had the pain and other symptoms daily, that movement caused – and also

worsened – the pain and other symptoms, that she could only stand 15-20 minutes before the pain occurred, and that rest sometimes helped the pain and other symptoms.  Echols listed her medications as methotrexate, prednisone, Toprol XL, and Ultracet.  She listed the side effects of methotrexate as hair loss, fatigue, and acne.  She noted that she was being weaned from prednisone, which was causing insomnia, nervousness, weight gain, and fluid retention.  When asked how her disability changed her relationship with others, Echols wrote, "can't stand to be around a lot of people[;] tends to make nervousness worse at times."  Echols described her average day as "rest."  Echols wrote on the last page of the interview outline, "at present condition seems to be worsening. I am being referred to several different [doctors] to find out exactly what the problem is."

On September 5, 2003, Echols saw cardiologist Dr. Charles R. Burnett.  Burnett believed that Echols was experiencing palpitations related to the combined effects of mitral valve prolapse, steroid effect, mild hypertension and unknown effect of myopathy and neuropathy.  He was concerned that Echols presented a high risk for small vessel pulmonary embolism.  Burnett ordered several lab tests, the results of which were normal.  Burnett also had Echols undergo a lung scan, which was negative, and a ventilation study, which was normal.

Echols attended physical therapy twice in September: once on September 15 and again on September 18.  Echols reported her current pain level as four out of ten, and her highest pain level as eight out of ten.  Echols did not return after the second session.

Echols began traveling to the Mayo Clinic in Rochester, Minnesota, for treatment in late September 2003.  In a preliminary interview dated September 23, Echols listed her chief complaints as muscle weakness in her legs, arms, and face, as well as feelings of heaviness and paralysis in her legs.  In a September 30 note summarizing Echols's medical history, Dr. Hossein Gharib, an

8

endocrinologist, wrote, "Her problems have been described as one of progressive weakness in the lower extremities associated with generalized myalgias.  Her physical examinations have been relatively unremarkable, including repeated neurologic evaluations."

As a part of her evaluation at Mayo Clinic, Echols saw Dr. Kenneth T. Calamia, a rheumatologist, on October 1, 2003.  Dr. Calamia noted that the prednisone treatment had resulted in Echols putting on considerable weight.  He noted that Echols had a tendency to have depression in the past but that Echols denied that her depression or other symptoms were a major problem at the present time.  After a physical examination of Echols, Dr. Calamia wrote, "On examination she appears well generally but she is overweight and possibly a bit cushingoid.  Joints: Unremarkable.  Neuro: Testing of her muscular strength is largely unremarkable.  There is a mild patchy diffuse muscular tenderness, worse in the lower extremities than the uppers.  Reflexes symmetrical and active."   Under "impression," Dr. Calamia wrote,

> I think it is possible that fibromyalgia or myofascial pain is the dominant problem here.  These can occasionally be triggered by an event such as a complicated delivery and have been persisting without hard evidence for inflammatory pathology.  She has had an EMG in the past showing some evidence of a peripheral neuropathy but this really would not be terribly consistent with her symptoms.  The findings of muscular tenderness suggest that myofascial pain is dominant.  Although the CPK does suggest the possibility of an underlying inflammatory process, the negative EMG in the past and muscle biopsy would point against this.  She did not clearly respond to prednisone except in what may be a very nonspecific way.

> If studies here confirm the absence of a likely inflammatory process, I think that treatment should be initiated as a myofascial pain syndrome or fibromyalgia. . . . I feel that therapeutic exercises would be ideal for her and this has been underway and she has tolerated this at least the first week before she left for her visit here.

Echols saw Dr. Gharib again on October 2.  He noted that Echols's laboratory studies were essentially normal.  Both an electrocardiogram and an EMG were also normal.

Echols saw Dr. Charles Bruce, a cardiologist at Mayo, on October 3.  Dr. Bruce summarized

the results of the heart tests performed on Echols:

> A Holter monitor performed on October 2, 2003, demonstrates sinus rhythm with
> sinus arrhythmia, rate varying from 76-140 beats per minute.  Average heart rate, 100
> beats per minute. . . . A transthoracic echocardiogram performed October 2, 2003,
> was entirely normal.  An estimate of right ventricular systolic pressure could not be
> obtained because no TR signal was detected, specifically systolic and diastolic
> function were normal.  Valve function was normal.  There was no evidence of mitral
> valve prolapse.

For "impression," Dr. Bruce wrote:

> #1 Unexplained shortness of breath with exertion with atypical noncardiac chest pain
> associated with generalized weakness and fatigue, muscle aches, and pains[.] This
> is associated with obesity and probable deconditioning.  She has preserved left
> ventricular systolic and diastolic function without significant valvular heart disease.
> I do not think she has a cardiac limitation to exercise.

> #2 At risk for obstructive sleep apnea syndrome[.] She has excessive snoring.  She
> certainly has the body habitus that would predispose her to this.

In his notes of his October 6 consultation with Echols, Dr. Bruce wrote that, although he was

surprised  by her abnormal cardiac response during the treadmill test, he attributed the abnormality

to her deconditioning and being overweight and not heart disease or diastolic dysfunction.  Dr. Bruce

referred Echols to the Cardiovascular Health Clinic for exercise prescription, weight loss, and an

intensive exercise program.   According to staff at that clinic, Echols did fine at the monitored

exercise session there.

Dr. Bahram Mokri, a neurologist at Mayo, saw Echols on October 3.  He noted that Echols

had elevated thyroid antibodies as well as mild elevation of CK.  He did not find much evidence of

myopathy, radiculopathy, neuropathy, or myelopathy on clinical examination.  In a note dated

October 23, Dr. Mokri summarized the results of the various tests that Echols had undergone.  He

stated that Echols's myasthenia gravis panel was normal; her outside left quadriceps muscle biopsy was diagnosed as denervation atrophy; her October 1, 2003, EMG was normal and showed no evidence of myopathy or neuropathy; her January 13, 2003, lumbar spine MRI showed normal alignment with no focal disk herniation and no significant degenerative changes; and her March 18, 2003, thoracic spine MRI was normal and showed no structural or signal abnormalities.

On October 29, 2003, Dr. Gharib reported to Dr. Burns, "[o]ur final diagnoses were:

- Neuromuscular symptoms of indeterminate significance and cause
- Doubt thyroid dysfunction
- Prednisone therapy
- Obesity
- Tachycardia
- Mitral valve prolapse
- Autoimmune thyroid disorder
- Endometriosis[.]"

Dr. Steve Owens, a medical consultant for Disability Determination for Social Security Administration, completed a physical residual functional capacity assessment dated October 1, 2003.[2]  Under "exertional limitations," Dr. Owens checked 50 pounds as the maximum Echols could occasionally lift and carry; 25 pounds as the maximum that Echols could frequently lift and carry; 6 hours in an 8-hour workday as the total amount of time Echols could stand or walk with normal breaks; 6 hours in an 8-hour workday as the total amount of time Echols could sit with normal breaks; and an unlimited ability to push and pull.  Dr. Owens found no other limitations.  Dr. Robert Redd reviewed all of the evidence on file and affirmed Dr. Owens's assessment as written on February 11, 2004.

--------

[2] Either the assessment was based solely on a review of medical records or the date is in error because Echols was at Mayo Clinic from September 30, 2003, through October 3, 2003, and from October 6, 2003, through October 8, 2003.  She had her rheumatology workup at Mayo Clinic on October 1, 2003.

Echols completed a disability report dated November 7, 2003. She listed the changes in her symptoms as palpitations, shortness of breath, muscle weakness, and fatigue. She wrote that she had been hospitalized for the palpitations and shortness of breath in August. She listed general weakness of upper and lower extremities, an inability to stand for short periods of time, pain and soreness in her muscles, involuntary tremors, and muscle spasms as affecting her ability to care for her personal needs. Echols noted no change in her daily activities since she last described them in September 2003.

On December 12, 2003, Echols again saw Dr. Menkes, who wrote as his assessment:

1.      Probable viral myositis. The patient states that she gets frequent viral infections. It is highly likely that her elevated CPK represented a viral myositis. Two previous CPK determinations have been entirely within normal limits. She also has a completely normal muscle strength examination today. For these reasons, I am of the opinion that this was an isolated episode of viral myositis that is very unlikely to recur. The pathophysiology of viral myositis was explained to the patient and her husband at length as part of a 30-minute counseling session.

2.      Fibromyalgia. Although she does not have every single symptom of fibromyalgia she certainly meets publish criteria for this disorder. This is a poorly understood condition that seems to respond to physical therapy, serotonin promoting agents and soporific agents. The pathophysiology of this disorder was explained to the patient and her husband as part of the counseling session. She agreed to the course of action as outlined in the next section.

3.      Intermittent tremor. The patient states that she has an enhanced physiologic tremor whenever she is in pain. It is very unlikely that she has another diagnosis other than enhanced physiologic tremor. I explained to her that a workup for tremor would include a CT scan of the head as well as serum test and a 24-hour urine. She stated that she did not wish to pursue this workup at this particular point in time. However, she stated that she might reconsider this decision in the future if her tremor does not improve.

Because Echols did not have an active neurologic disease, Dr. Menkes did not schedule a follow-up visit.

During the spring of 2004, Echols continued to see Dr. Burns frequently with substantially the same complaints that she had voiced for some time.  On May 27, 2004, she saw Dr. G. Lee Cranfill for the first time.  After obtaining records from Dr. Chan, Semmes Murphey Clinic, and Mayo Clinic, he wrote:

> HISTORY OF PRESENT ILLNESS:  Ms. Echols comes in today for follow up as instructed.  I reviewed all of her records from the Mayo Clinic and they were quite extensive.  Essentially a negative work up.  Work up from Dr. Chan was reviewed as well and it was also negative.
>
> She saw Dr. Cohen as thought to probably have asthma and has a follow up appointment with him.
>
> PHYSICAL EXAM:  BP 100/76, P 68 and regular, R 12, WT 178.
>
> ASSESSMENT: I think Ms. Echols's symptoms are due to fibromyalgia and possibly depression as well as deconditioning.  Complete work up was otherwise unremarkable.  I suspect that a lot of her trouble in the past was possibly psychosomatic as well as a combination from empiric treatment, specifically the Prednisone which she was given to take at a 100 mg daily which caused 40 pounds of weight gain in a month.
>
> Beginning Elavil q h.s.  I went over in great detail an exercise program and stressed to her how important this was.  She is to follow the instructions per Dr. Cohen for her asthma.
>
> All of this was gone over today in an approximately 25 minute discussion with her and she understands what we are talking about although somewhat disappointed that no specific diagnosis can be given at this point for her previous symptoms in the past.

Dr. Cranfill continued to see Echols until September.

In October of 2004, Echols began to see Dr. Shalender Mittal, who gave her the following diagnoses: asthma, hyperlipidemia, a history of mild hepatic dysfunction, sleep apnea, fibromyalgia,

palpitations, uterine fibroids, and endometriosis.  In later visits, he added anxiety disorder, bilateral leg cramp, possibly secondary to leg cramp, and tachyarrhythmia, though the anxiety disorder and leg cramps were dropped from the list of diagnoses on June 25, 2005, which is the last assessment by Dr. Mittal in the record before this Court.

On May 19, 2005, Dr. Mittal reported that Echols could occasionally lift or carry less than 10 pounds, stand and walk for a total of three hours during a work day and do so continuously for two hours, sit for a total of four hours during a work day and do so continuously for three to four hours.  He said that she had significant limitations in pushing and pulling due to severe muscle pains. He said that she could occasionally climb, balance, stoop, kneel, crouch, and bend.  He reported that she had severe muscle pains and myopathy activity.  He said that her exercise tolerance was very limited.  He said that she had multiple areas of muscle soreness, frequent palpitations, shortness of breath, elevated liver enzymes (AST, ALT) and muscle enzymes (CPK).  In June 2005, Dr. Mittal referred Echols to a rheumatologist, Dr. Charles R. Akin, whose impressions were diffuse myalgias and arthralgias, mildly elevated CPK, fibromyalgia syndrome, and mild neuropathy, possibly denervation at L5.

**B.    HEARING EVIDENCE**

At the July 19, 2005, hearing, Echols testified about her daily activities.  She stated that she and her husband took her children to school.  She testified that she watched their four-year daughter during the day while her other children were at school and her husband was at work.  She testified that she attended all the sporting events of her children, including basketball, football, and baseball games.  She testified that she cooked, did the laundry, and cleaned, though she could only do a room per day.

14

Echols also testified about her subjective complaints of pain, fatigue, numbness, and weakness:

Q.      Well, were you having problems with pain back then?

A.      Yes, yes.

Q.      Problems with fatigue?

A.      Yes.

Q.      [I]s there something else that your, you mentioned earlier your legs just –

A.      Yeah, they'll, they get very, very tired, and sometimes I just fall because they get, it's like they just get so weak and they go numb.

Q.      But do you also, you have an element of general muscle weakness –

A.      Yes.

Q.      – and then an element of fatigue as well, kinda general body fatigue?

A.      Yes.

Q.      And then pain –

A.      Then pain.

* * *

Q.      And this is something that is present to some extent each and every day?

A.      Yes, every day. . . .  I might get up that morning and I might feel okay, but couple hours, I start feeling, you know, the tiredness, the weakness, the pain is always present but it does get better sometimes.

* * *

Q.      So if, let's say one of the doctor's office you had worked for, hospital you worked for said we need somebody to sit here and go through medical records or sit here and answer the phone or, you know, be the appointment clerk, so it's a sit down job . . . but you gotta be there eight hours a day, five days a week, could you have done that sedentary type job on a regular basis back in '03?

A.      I tried that. . . .  [B]ut, I was just in pain, I mean, it's hard to sit and do anything when you're in pain.

* * *

Q.      [I]f somebody did have that job for you, eight hours a day, five days a week back then, even though it was sit down, you still wouldn't have been able to do it full-time?

A.      No.

Echols also testified that she had the pain, weakness, and fatigue regardless of how physically active she was and that she was in too much pain to exercise.

Echols's husband Mark testified about Echols's condition.  He stated that Echols was a very active person.  He stated that her activity level significantly decreased, however, after the birth of their youngest child in 2000.  He stated that she walks slowly and was at 65 to 70% of her capacity for physical activities.  He testified that Echols assisted him directing the choir for their church, which required  her to attend practice every Wednesday night and periodically lead the group in his absence.

The ALJ then questioned Mack Welch, the vocational expert.  He testified about Echols's past relevant work.  He stated that Echols's position as a bank teller was a semi-skilled position classified in the light exertional category.  He stated that the position of general-duty nurse was a skilled position classified in the medium exertional category, while the office nurse was a skilled position listed in the light exertional category.

## C.      ALJ DECISION

The ALJ issued a written opinion finding Echols not disabled.  In that opinion, the ALJ undertook the following five-step analysis to determine whether Echols was disabled: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe

and medically determinable physical or mental impairment; (3) whether the claimant may be deemed

disabled because the impairment meets or equals a listed impairment in Appendix 1 to Subpart P,

Title 20, Code of Federal Regulations; (4) whether the claimant is able to return to past relevant

work, despite the impairment; and if not (5) whether the claimant can perform any other kind of

work. 20 C.F.R. §§ 416.920 and 404.1520. *See Cox v. Barnhart*, 345 F.3d 606, 608 n.1 (8th Cir.

2003).

The ALJ found that Echols had engaged in substantial gainful activity since the alleged onset

date. Because the evidence supported findings that Echols engaged in substantial gainful activity

from October 10, 2000, through October 1, 2002, and that Echols insured status expired on June 30,

2003, the ALJ regarded the relevant time period for determining whether Echols was disabled to run

from October 1, 2002, to June 30, 2003.

The ALJ found that Echols had the following impairments during the relevant time period:

bursitis of the left shoulder, nonspecific arthritis, some evidence of neuropathy (numbness and tingling)

in the lower extremities, leg pain with occasional muscle spasms (diagnosed as myopathy), and a goiter.

The ALJ found that Echols had a severe impairment, but not an impairment or combination of

impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

(Tr. 15.)

The ALJ evaluated Echols's subjective allegations and complaints pursuant to the criteria set

forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984). These include the claimant's prior work

record, and observations by third parties and treating and examining physicians relating to such matters

as (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3)

precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5)

functional restrictions. *Id*. at 1322. The ALJ found Echols's subjective allegations not to be borne out by the overall record or not to be fully credible. First, he found her daily activities to be inconsistent with her alleged level of pain:

> The claimant's daily activities were rather extraordinary for a person with her alleged pain and limitations. She testified that she has four children at home, ages 13, 10 year-old twins, and a 4 year-old. Her husband works 4 days on and 4 days off, so she is alone with the children quite a bit. She testified that she is able to cook, clean, and do the laundry. She does not have any help with the housework or with the children. The four year-old child stays home with her, and does not go to day care. She also testified that three of her children are very active in sports at school and that she goes to most of their games. During many months, this could add up to several games per week, and would involve walking from the car to the bleachers and sitting for extended periods of time. Her husband testified that he is the choir director for their church of about 200 members, and that she is the assistant choir director. The choir practices once a week. When he is at work and cannot be there, she directs the 20-member choir for him. Too, they often entertain in their home and she is solely responsible for getting the house ready for guests and prepares all of the food. The claimant's daily activities are certainly not indicative of an individual who is completely unable to work.

After a thorough examination of the medical records, the ALJ continued:

> In assessing the claimant's credibility, her work record has been examined . . . . Her work record neither adds nor detracts from her credibility. Her earnings in 2001 and 2002 (after her alleged onset date) were among the highest earning years on her record.

> Although the claimant provided third party testimony, this testimony was vague in nature and relied heavily upon the witness'[s] uncritical acceptance of the claimant's subjective complaints. The Administrative Law Judge is skeptical of the objectivity of this testimony to the degree that she is disabled, because it is not fully supported by the medical record or by the claimant's daily activities. It is true that under relevant authority, corroborative statements and testimony of third parties must be seriously considered. However, it need not be automatically treated as credible or as substantial evidence to support the claimant's allegations. See, Smith v. Heckler, 735 F.2d 312 (8th Cir. 1984[)]; and Rautio v. Bowen, 862 F.2d 130 (8th Cir. 1988). Testimony of third parties that is suspect may be properly discredited. Brown v. Chater, 87 F.3d 963, 965-66 (8th Cir. 1996).

> In accordance with Social Security Ruling 96-6p, all the medical records in the case record have been considered in reaching this decision, including in particular, available and relevant medical sources and the medical opinions of the State Agency medical and

> psychological consultants and other non-examining sources . . . . I have considered the opinions of the State Agency medical consultants and note they have expressed the opinion that the claimant could perform a full range of medium work.   These independent, identical conclusions from medical experts to the Commissioner are not binding on the Commissioner, but they are medical judgments and expert opinions supportive of my finding that the claimant is not disabled (SSR 96-6p).

The ALJ concluded that, despite Echols's subjective complaints of muscle pain, spasms, weakness, paresthesias, paralysis, and palpitations, Echols retained the residual functional capacity for a full range of light, skilled work during the relevant time period.  Because of the vocational expert's testimony, the ALJ concluded that Echols could return to her past work as an office nurse or a bank teller.

## IV.

On appeal, Echols argues that the Commissioner's decision that she is not disabled is not supported by substantial evidence in the record as a whole.  More specifically, she argues that the ALJ erred in finding that she was not fully credible and that he erred in finding that she could do a full range of light work.  She cites, among other cases, *Forehand v. Barnhart*, 364 F.3d 984 (8th Cir. 2004), where the Eighth Circuit reversed a case because the ALJ gave "little weight to the consistent diagnosis of fibromyalgia or its debilitating effect."  *Id*. at 987.  The court also stated:

> The ALJ further found that Forehand's allegations of limitation were inconsistent with her daily activities. Forehand's ability to engage in some life activities, however, does not support a finding that she retains the ability to work. *See* [*Brosnahan v. Barnhart*, 336 F.3d 671, 677 (8th Cir. 2003)] ("[W]e have held, in the context of a fibromyalgia case, that the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity.").  We have long stated that to determine whether a claimant has the residual functional capacity necessary to be able to work we look to whether she has "the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir.1982) (en banc). This test is consistent with relevant regulations on the issue, *see* 20 C.F.R. § 404.1545, and we have reiterated it on a number of occasions, *see*, *e.g.*, [*Cox v. Barnhart*, 345 F.3d 606, 610 (8th Cir. 2003)] (restating *McCoy* standard); [*Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998)]

(noting the "most important issue" in a disability determination is whether the claimant has "the ability to do the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world"); *Ingram v. Chater,* 107 F.3d 598, 604 (8th Cir.1997) (repeating *McCoy* test); *Pope v. Bowen,* 886 F.2d 1038, 1041 (8th Cir.1989) (same); *Martonik v. Heckler,* 773 F.2d 236, 239-40 (8th Cir.1985) (same). Notwithstanding this well-settled case law, our mandate is frequently ignored, and appears to have been in this case.

*Id.* at 988. The Eighth Circuit reiterated the holding of *Forehand* in *Garza v. Barnhart*, 397 F.3d 1087 (8th Cir. 2005). There, the Eighth Circuit held that the ALJ failed to consider whether fibromyalgia was a severe impairment and remanded for reconsideration on that issue. *Id.* at 1089.

Here, the ALJ stated in his opinion: "It was not until December 2003, six months after her date last insured under Title II, that a possible diagnosis was made. It was opined that she may have viral myositis, fibromyalgia, and an intermittent tremor (Exhibit 9F)." He also said, "Dr. Cranfill stated that her symptoms were due to fibromyalgia and possibly depression as well as deconditioning." Otherwise, he did not mention fibromyalgia. He did not note that the rheumatologist at Mayo Clinic had said on October 1, 2003, "I think it is possible that fibromyalgia or myofascial pain is the dominant problem here." He did not include fibromyalgia as one of Echols's impairments established by the medical evidence, nor did he explain this omission from the list of impairments. It cannot be determined from the ALJ's opinion whether the omission of fibromyalgia from the list of impairments was inadvertent, whether the ALJ concluded that the onset of fibromyalgia was after June 30, 2003, or whether he believed merely that the medical evidence failed to establish whether or not Echols had fibromyalgia during the relevant period. Nor can the Court determine whether the ALJ considered the diagnosis of fibromyalgia when he made his assessment of Echols's credibility and when he determined her residual functional capacity.

Because the Court cannot determine from the ALJ's opinion what, if anything, he concluded about Echols's fibromyalgia during the relevant period, this case will be remanded for more specific findings.  If the ALJ finds that Echols had fibromyalgia during the relevant period, it will be necessary for him to address the combination of Echols's impairments, including fibromyalgia, in light of *Forehand*, *Garza*, *Brosnahan v. Barnhart*, 364 F.3d 671 (8th Cir. 2003), and *Tennant v. Apfel*, 224 F.3d 869 (8th Cir. 2000), as well as any other relevant cases, statutes, and regulations pertaining to fibromyalgia.  On the other hand, if the ALJ concludes that Echols did not have fibromyalgia during the relevant period, the reasons that lead to that conclusion should be explained so that the Court can engage in meaningful review.

Echols also complains that the ALJ failed to distinguish between the level of her daily activity at the time of the hearing in July 2005 and the level of her daily activity during the relevant period.  On remand, the ALJ should make more specific findings on the issue of the level of Echols's daily activities, expressly stating whether his findings relate to her daily activity in 2005, during the relevant period between October 1, 2002, and June 30, 2003, or both.

## CONCLUSION

For the reasons stated above, the decision of the Commissioner if reversed, and this case is remanded to the Commissioner for more specific findings.  This is a sentence four remand.

IT IS SO ORDERED this 27th day of August, 2007.


_____

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE

21